WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| S.G.D. Engineering Limited,<br><br>Plaintiff,<br><br>v.<br><br>Lockheed Martin Corporation Incorporated,<br><br>Defendant. | No. CV-11-02493-PHX-DGC<br><br>**ORDER** |

Plaintiff has filed a motion for summary judgment. Doc. 109. The motion is fully briefed. For the following reasons, the Court will grant in part and deny in part Plaintiff's motion.[1]

**I.    Background Facts.**

Toshiba contracted with the Japanese Ministry of Defense ("JMOD") to provide components for F-15 fighter jets. On August 31, 2007, Toshiba entered into a contract ("Prime Contract") with Defendant Lockheed Martin Corporation, Inc. to design and build a Synthetic Aperture Radar Reconnaissance Pod ("SRP"). The SRP was designed to attach externally to the belly of an F-15 airplane and provide target and intelligence imagery. The Prime Contract provides for liquidated damages measured at a rate of $1 per $1,000 of the value of undelivered items for each full day that delivery is delayed.

---

[1] The request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Liquidated damages are capped at five percent of the value of the undelivered items. In addition, Defendant can be liable for liquidated damages only to the extent Toshiba is assessed liquidated damages or price reductions by JMOD.

Defendant solicited bids from pod manufacturers, including Plaintiff S.G.D. Engineering, Ltd. Defendant did not include a liquidated damages clause in the bid request or the subcontract. Plaintiff won the subcontract. The parties agreed on a price of $5,870,680 for Plaintiff's services, which would be paid in increments upon the completion of "milestones" identified in the statement of work ("SOW"). The subcontract required Plaintiff, among other things, to design, manufacture, acceptance test, and deliver a pod, and to submit extensive engineering reports for review by Defendant. A milestone would be deemed complete only when all deliverables and efforts specified in the SOW were delivered, accepted, verified, and approved by Defendant. Defendant reserved the right to terminate the subcontract for default or convenience. In the case of a termination for default, Defendant was required to compensate Plaintiff for work actually delivered and accepted. All performance on the contract was due on May 8, 2009.

In March 2008, Defendant notified Plaintiff that Boeing would conduct a functional flight test ("BFFT") to determine whether the SRP was operational and to gauge its capabilities. Plaintiff submitted the necessary materials to Boeing. Boeing complained that there were significant deficiencies in the engineering reports submitted by Plaintiff, which delayed the BFFT and resulted in significant expenses for Defendant. Boeing did not approve the SRP for flight and did not conduct the BFFT until August 2010.

The parties modified the subcontract to permit delivery of the SRP in October 2009. Plaintiff delivered the SRP in October 2009, but the SRP was damaged during shipment. Defendant contends that Plaintiff provided grossly deficient engineering reports to accompany the SRP. Defendant asserts that the deficiencies represented a breach of the subcontract which delayed Defendant's ability to satisfy its obligations

under the Prime Contract. Plaintiff asserts that other delays unrelated to Plaintiff's performance accounted for Defendant's inability to fulfill its obligations under the Prime Contract. The SRP was eventually shipped to Toshiba in September 2010.

After shipping the SRP, Plaintiff submitted invoices for the final three milestones of the subcontract. Defendant rejected the invoices, claiming that Plaintiff had not fulfilled its obligations under the milestones. The parties met in Goodyear, Arizona in November 2010 and reached an agreement to resolve the dispute and clarify what work Plaintiff needed to complete in order to be paid under the milestones. Plaintiff asserts that Defendant entered into the November 2010 agreement in bad faith because Defendant intended to induce Plaintiff to perform more work without paying. Defendant counters that Plaintiff simply failed to meet the deadlines established in the November 2010 agreement.

In February 2011, JMOD terminated its contract with Toshiba due to delay. Toshiba did not cancel the Prime Contract, however, because it still hoped to sell the SRP to JMOD. Toshiba and Defendant identified a list of items that Defendant needed to perform to qualify for payment under the Prime Contract. Defendant therefore continued work with Plaintiff to reach remaining subcontract milestones. Plaintiff submitted its final engineering reports and drawings in June 2011. Defendant asserts that these reports were still deficient. In fact, Defendant alleges that it was so skeptical about the integrity of the data and quality of the calculations made by Plaintiff that Defendant hired a third-party to analyze the materials. The third-party indicated that the SRP's properties as found and reported by Plaintiff were not substantiated by test data. On September 15, 2011, Defendant terminated Plaintiff for default and refused to pay Plaintiff for the remaining milestones, asserting that Plaintiff still had not fully performed under the subcontract. Despite terminating Plaintiff for default, Defendant has represented to Toshiba that it is entitled to payment under the Prime Contract because the Prime Contract is complete subject to "final update."

Plaintiff asserts claims for breach of contract and breach of the duty of good faith

1  and fair dealing. Plaintiff has been paid for all but three of the subcontract milestones, leaving an unpaid balance of $753,900. Defendant has counterclaimed for approximately $73 million in damages. These damages include the full price of the Prime Contract, liquidated damages under the Prime Contract, Boeing charges assessed to Toshiba, lost profits, and miscellaneous expenses incurred as a result of Plaintiff's alleged failures.

**II.     Legal Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III.    Analysis.**

    **A.     Defendant's Motion to Supplement its Response.**

Plaintiff asserts that the evidence Defendant has offered to oppose summary judgment is inadmissible and may not be considered. Doc. 130 at 1; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (holding that a court may consider only admissible evidence in ruling on a motion for summary judgment). Defendant has moved to supplement its response and statement of facts. Doc. 133. The Court will grant Defendant's motion. The Federal Rules of Civil Procedure are "to be liberally construed to effectuate the general purpose of seeing that cases are tried on the merits." *Rodgers v. Watt*, 722 F.2d 456, 459 (9th Cir. 1983). When a party fails to support an assertion of fact or fails properly to address another party's assertion of fact as required by Rule 56(c), a court may afford an opportunity to support or address the fact. Fed. R. Civ.

P. 56(e)(1). Defendant does not seek to introduce new facts or make new arguments in its supplement. Instead, it presents previously proffered facts in a form that can be considered on a motion for summary judgment.

Plaintiff requests leave to make additional evidentiary objections to Defendant's supplement. Doc. 135 at 2. The Court does not require additional briefing.

### B. Rule 30(b)(6) Deponents.

On November 12, 2012, Plaintiff served a notice of deposition pursuant to Rule 30(b)(6). Topic 58 identified in the notice required Defendant to designate a witness to testify regarding Plaintiff's alleged deficient performance under the November 2010 agreement. On December 10, 2012, Defendant designated Eric Marx as its deponent for topic 58. At the deposition, however, Mr. Marx testified that he did not know about Plaintiff's deficient performance, had not performed any research, and did not interview any other employees to prepare. Subsequently, Defendant gave notice to Plaintiff regarding the designation of two witnesses, Clifford Middleton and George Locke, who could testify about topic 58. Plaintiff subsequently deposed Mr. Middleton and Mr. Locke.

Relying on *Rainey v. American Forest & Paper Ass'n, Inc.*, 26 F.Supp.2d 82 (D.D.C. 1998), Plaintiff argues that Defendant should be barred from relying on the depositions of Mr. Middleton and Mr. Lock. Doc. 130 at 5. In *Rainey*, the court refused to consider information contained in an affidavit that was introduced for the first time in opposition to summary judgment. The information differed drastically from testimony provided by the 30(b)(6) deponents who had testified on behalf of the defendant. Here, Defendant designated substitute deponents on topic 58 after it became apparent that the Marx deposition was unsatisfactory. Plaintiff deposed the witnesses, and did not seek to recover fees for the additional depositions. The merits relief it seeks is unwarranted where Defendant provided substitute deponents.

/ / /

/ / /

**C.     Summary Judgment.**

**1.     Breach of Contract and Covenant of Good Faith.**

Under Arizona law, "[i]nterpretation of a contract is a question of law for the court where the terms of a contract are found to be plain and unambiguous." *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993). Arizona law has adopted the concept of "substantial performance." *See SC34 v. Desert Mountain Master Ass'n*, No. 1 CA-CV 11-0240, 2013 WL 1174135, at *11 (Ariz. Ct. App. March 21, 2013); Revised Arizona Jury Instruction (Civil), Contract 10, Substantial Performance. A party is entitled to relief if it has substantially performed the contract. *See* Restatement (Second) of Contracts § 237 cmt. d (1981). If the contract makes full performance a condition, however, substantial performance is not sufficient and a party who has substantially but not fully performed is not entitled to relief. *Id.*

Arizona law implies a duty of good faith and fair dealing in every contract to assure that "neither party will act to impair the right of the other to receive benefits which flow from" their contractual relationship. *Rawlings v. Apodaca*, 726 P.2d 565, 569-70 (Ariz. 1986). The duty prohibits "[a] variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." Restatement (Second) of Contracts § 205 cmt. a (1981). "[B]ecause a party may be injured when the other party to a contract manipulates bargaining power to its own advantage, a party may nevertheless breach its duty of good faith without actually breaching an express covenant in the contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 30 (Ariz. 2002). The duty of good faith and fair dealing "preserve[s] the spirit of the bargain rather than the letter and guarantees the protection of the parties' reasonable expectations, such being the basic purpose of contract law." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002) (quotation omitted). The duty to act in good faith does not, however, "alter the specific obligations of the parties under the contract. . . . Acts in accord with the terms of one's contract cannot *without more* be equated with bad faith."

*Wells Fargo Bank*, 38 P.3d at 30 (emphasis in original; quotation omitted).

Applying Arizona law, and viewing the evidence in the light most favorable to Defendant, the Court concludes that Defendant has presented a genuine issue of material fact on Plaintiff's claims for breach of contract and breach of the duty of good faith and fair dealing.

The subcontract grants Defendant significant discretion to modify material portions of the agreement. For example, subsection 4(a) permits Defendant to make changes within the general scope of the contract to "(i) drawings, design, or specifications; (ii) method of shipping or packing; (iii) place of inspection, acceptance, or point of delivery; and (iv) delivery schedule." Doc. 110-2 at 10. Defendant also reserved the right to direct and coordinate Plaintiff's performance under the subcontract with other efforts in Defendant's larger effort to perform the Prime Contract, undoubtedly because any deficiencies or delays in Plaintiff's performance could jeopardize Defendant's performance of the Prime Contract. The subcontract states that "[Plaintiff] shall be compensated only for work actually delivered and accepted." Doc. 110-2 at 11. The subcontract also provides that "[i]f [Plaintiff] delivers non-conforming [w]ork, [Defendant] may; (i) accept all or part of such [w]ork at an equitable price reduction; (ii) reject such [w]ork; or (iii) make, or have a third party make, all repairs, modifications, or replacements necessary to enable such [w]ork to comply in all respects with [c]ontract requirements and charge the cost incurred to [Plaintiff]." The Court construes these provisions as an election out of the substantial performance standard available under Arizona law.

Defendant sent Plaintiff a letter on September 6, 2011, informing Plaintiff that it would not be paid for the final three milestones. On September 15, 2011, Defendant sent another letter officially terminating the subcontract for default. Defendant has proffered evidence in the form of business records, meeting minutes, and deposition testimony from which a reasonable jury could conclude that Plaintiff is not entitled to payment because delivery was not accepted. Defendant's evidence, if believed, also suggests that

1  Defendant terminated the subcontract in good faith because Plaintiff repeatedly failed to
2  provide acceptable engineering reports required to substantiate claims about the SRP and
3  entitle Plaintiff to payment under the final three milestones.

4        The Court's conclusion is driven in part by its disagreement with Plaintiff as to
5  what "accept" means in the context of this contract. Plaintiff seems to argue that
6  Defendant's receipt of the final engineering reports along with continuing physical
7  custody over the reports constitutes acceptance. Doc. 130 at 4. But the subcontract
8  expressly grants Defendant the ability to receive Plaintiff's engineering reports,
9  determine whether they are deficient, and cure their deficiencies, all without "accepting"
10 Plaintiff's performance. Plaintiff cites to the UCC in support of its interpretation of
11 "acceptance," but the UCC refutes Plaintiff's interpretation. The UCC provides that
12 acceptance of goods occurs when the buyer "signifies to the seller that the goods are
13 conforming or that he will take and retain them in spite of their non-conformity," or "fails
14 to make an effective rejection," or "does any act inconsistent with [Plaintiff]'s
15 ownership" of the subject matter. Ariz. Rev. Stat. § 47-2606. Defendant has presented
16 evidence that Plaintiff delivered defective engineering reports and that Defendant made
17 an effective rejection.

18       Plaintiff asserts that it is entitled to payment regardless of whether it fully or
19 substantially performed the final three milestones. Doc. 109 at 11. Plaintiff cites
20 subcontract language providing that Defendant must reimburse Plaintiff for "[w]ork in
21 process up to and including the date of termination." Doc. 130 at 3l; Doc. 110-2 at 17.
22 This citation is inapposite, however, because the quoted language secures Plaintiff's right
23 to remuneration only where Defendant terminates the subcontract for convenience.
24 Defendant asserts that the subcontract was terminated for default, and has provided
25 evidence to support its assertion.

26       Plaintiff argues that "[i]f [Defendant's] interpretation of the [s]ubcontract and
27 applicable contract law were correct, [Defendant] could terminate every subcontractor
28 after reaching 99.9% completion without ever making a payment for the services

1  provided." Doc. 130 at 5. But Plaintiff assented to subcontract terms that imposed
2  exacting standards of quality on Plaintiff's performance. The Court's role is not to
3  rewrite the parties' agreement. So long as Defendant implemented the termination clause
4  correctly and in good faith, the Court must enforce it. As mentioned above, Defendant
5  has proffered evidence that would permit a rational jury to find that Plaintiff was in
6  default when Defendant invoked the termination clause. Defendant's valid exercise of its
7  contractual rights is not a breach of the contract or the duty of good faith and fair dealing
8  even if that decision imposes harsh consequences on Plaintiff.[2]

9  Plaintiff argues that Defendant's representation to Toshiba that the Prime Contract
10 is complete subject to "final update" is logically inconsistent with Defendant's contention
11 that Plaintiff has not adequately performed the subcontract. Doc. 109 at 9; Doc. 130 at 4.
12 This is a good jury argument. Because the subcontract entailed only a portion of the total
13 work due under the Prime Contract, however, a jury might conclude that the Prime
14 Contract was substantially performed even though the subcontract was not performed
15 completely. Defendant has submitted evidence that the Prime Contract was "complete
16 subject to final update" precisely because Plaintiff failed to properly perform the
17 subcontract.

18 **2.   Damages.**

19 A party claiming breach must prove damages resulting from the breach.
20 *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004). Compensatory
21 damages, which arise directly from the breach itself, are recoverable as a matter of
22 course. So too are consequential damages, which are reasonably foreseeable
23 consequences of breach less mitigated costs. *See* Restatement (Second) of Contracts

---

[2] The subcontract does provide that "[Defendant] may require [Plaintiff] to deliver to [Defendant] any supplies and materials, manufacturing materials, and manufacturing drawings that [Plaintiff] has specifically produced or acquired for the terminated portion of this Contract. [Defendant] and [Plaintiff] shall agree on the amount of payment for these other deliverables." Doc. 110-2 at 11. The subcontract thus appears to impose an obligation on Defendant and Plaintiff to agree on a price for the engineering reports notwithstanding their deficiencies when the contract is terminated for default. Plaintiff makes no argument that this provision has been breached.

§ 347 (1981); *E-Z Livin' Mobile Homes, Inc. v. Tommaney*, 550 P.2d 658, 662 (Ariz. Ct. App. 1976). "[C]ertainty in amount of damages is not essential to recovery when the *fact* of damage is proven." *Gilmore v. Cohen*, 386 P.2d 81, 82 (Ariz. 1963) (emphasis in original; quotation omitted). The party claiming damages "should supply some reasonable basis for computing the amount of damage and must do so with precision as, from the nature of his claim and the available evidence, is possible." *Walter v. Simmons*, 818 P.2d 214, 221 (Ariz. Ct. App. 1991).

As damages for its counterclaim, Defendant claims: (1) $1,340,244.50 in pass-through liquidated damages stemming from Plaintiff's delay, which caused Defendant to breach the Prime Contract; (2) $640,177 in charges to Toshiba, passed through to Defendant, that were billed by Boeing engineers to correct the inadequate models and reports submitted by Plaintiff; (3) $1,429,518 for other costs incurred as a result of Plaintiff's failures that were billed by Boeing to Toshiba and passed through to Defendant; (4) $30 million in lost profits stemming from JMOD's termination of the contract with Toshiba; (5) $1,429,518.90 in expenses arising from Plaintiff's delays relating to the BFFT; (6) $938,089 in expenses incurred in connection with the November 2010 meeting; (7) $511,734 in expenses incurred internally to rectify errors in engineering reports submitted by Plaintiff; (8) $13,310 stemming from a faulty heat exchanger on the SRP; (9) $33,046 in expenses to travel to Israel; and (10) $26,092 in damages suffered by the SRP during shipment.

### a. Liquidated Damages.

Defendant has produced evidence that liquidated damages might be assessed against Defendant by Toshiba in the future. In addition, Toshiba has withheld $2,596,000 in payments due to Defendant under the Prime Contract. Defendant asserts that it may recover the liquidated damages against Plaintiff because they stem from Plaintiff's default.

Plaintiff contends that the liquidated damages cannot be recovered in this action for three reasons, but the Court need only address the first. Plaintiff argues that the

damages are speculative. Because it is uncertain whether Defendant will ever be held liable to Toshiba for liquidated damages, Plaintiff asserts that Defendant may not preemptively pass the liquidated damages through to Plaintiff. Defendant responds that Toshiba has assessed liquidated damages against Defendant in the amount of $1,340,244.50 and has withheld payment of $2,596,000 still due under the Prime Contract to cover these liquidated damages and other damages.

The Court concludes that Defendant's claim for liquidated damages is speculative. Defendant makes clear that it is not assessing liquidated damages against Plaintiff – it has no right to do so under the subcontract – but instead is making a claim for consequential damages arising out of its expected payment of liquidated damages to Toshiba. In support of this claim, Defendant provides two letters it received from Toshiba. Doc. 122-6, Ex. CC, DD. Although Defendant states that Toshiba has "assessed" liquidated damages against it, the letters describe the liquidated damages as a "claim." *Id.* Toshiba states in the letters that it expects to be assessed liquidated damages by JMOD in the future, and notes that the amount of its claim may need to be recalculated "based on the actual rate of the Liquidated Damages . . . assessed to Toshiba." Doc. 122-6, Ex. DD. The letters thus make clear that Toshiba has not been assessed and has not paid liquidated damages, and is merely making a claim against Defendant in the expectation that JMOD will seek liquidated damages at some future point. Likewise, Defendant has not been assessed and has not paid liquidated damages, and is merely making a claim in this case in the expectation that it will pay liquidated damages to Toshiba in the future. Until it actually pays such damages, Defendant's claim clearly is speculative.

Defendant suggests that it has in fact paid such damages because Toshiba has withheld more than $2 million in payments to Defendant, but Defendant admits that Toshiba's claim against Defendant exceeds the amount it has withheld. As a result, there currently is no way to determine whether Defendant ultimately will pay liquidated damages and, if so, the amount. Nor has Defendant presented evidence that the claimed liquidated damages would be entirely attributable to Plaintiff. Because Defendant cannot

1   recover speculative damages, the Court will enter summary judgment on the liquidated
2   damages claim.

### b. Boeing Charges.

Defendant asserts that because Plaintiff consistently failed to submit adequate models and reports, Boeing engineers were required to correct Plaintiff's submitted models, complete calculations, and perform other work necessary to obtain approval from Boeing's certification board to permit the SRP to be used in the BFFT. Boeing charged Toshiba $640,177 for this additional, unanticipated work. Toshiba in turn claimed $640,177 in damages against Defendant. Doc. 122-6, Ex. DD. Boeing also charged Toshiba $1,429,518.90 for similar efforts related to the BFFT, and Toshiba claimed these costs from Defendant because they related to deficient performance of the Prime Contract. *Id.* The only evidence produced by Defendant to substantiate damages stemming from the Boeing charges is an email dated February 3, 2011, sent from a Toshiba employee. *Id*. Even assuming this email could survive a hearsay objection because it would be admissible under Federal Rule of Evidence 803(6) (*see* Doc. 133-1 at 5), the email states that Toshiba is merely claiming the Boeing charges as damages and requests that Defendant "come to Japan and hold a face-to-face discussion in February 2011 to settle these damages." *Id*. Defendant has not provided any evidence describing the February 2011 settlement discussions, and has failed to demonstrate that these damages actually were assessed by Toshiba or paid by Defendant. Because the evidence produced by Defendant would not be sufficient for a reasonable jury to conclude that the Boeing charges have been paid by Defendant, the Court will grant Plaintiff summary judgment on the counterclaim for the Boeing charges. *Anderson*, 477 U.S. at 248.

### c. Lost Profits.

Defendant asserts a $30 million claim for lost profits stemming from JMOD's termination of its contract with Toshiba. A party claiming lost profits must establish the lost profits with "reasonable certainty." *See Felder v. Physiotherapy Assocs.*, 158 P.3d 877, 887 (Ariz. Ct. App. 2007). "[W]here it can be proven that profits were lost, doubts

as to the extent of the injury should be resolved in favor of the innocent [party] and against the wrongdoer." *Id*. (quotation omitted).

Viewing the evidence in the light most favorable to Defendant, the Court concludes that Defendant has not submitted enough evidence to support its claim for lost profits. Defendant relies on testimony given by Gregg Johnson, one of its Rule 30(b)(6) deponents. When asked why Defendant was entitled to damages for lost sales, Mr. Johnson responded: "Again, you know, in discussions with Toshiba, both Toshiba and Lockheed Martin believe that there was – in the – in the meetings that I had with them, they stated up to five additional systems were – were in the plan, and they even showed us – or discussed with us the budget cycle on when those systems might be phased in." Doc. 122-5 at 59. Even if Mr. Johnson could provide the same testimony at trial that he provided in the deposition, statements he attributes to Toshiba are inadmissible hearsay – out-of-court statements offered for the truth of the matter asserted. Defendant also cites one agenda line from minutes of a 2010 meeting between Defendant and Toshiba which makes reference to "future pods." Doc. 122-5 at 62.

Aside from this inadmissible hearsay and a passing reference to future pods, Defendant provides no evidence to support its claim for lost profits. Defendant has produced no communications or commitment by JMOD or Toshiba concerning the need for future pods or indicating that Defendant would be the source of such pods. This evidence, which supports at most a weak expectation by Defendant that future work might be available, does not rise to the level of "reasonable certainty" required to recover lost profits. *Felder*, 158 P.3d at 887. Because the evidence produced by Defendant would not be sufficient for a reasonable jury to conclude that lost profits have been proven with reasonable certainty, the Court will grant Plaintiff summary judgment on the counterclaim for lost profits. *Anderson*, 477 U.S. at 248.

### d.     Miscellaneous Internal Expenses.

Defendant has counterclaimed for a variety of miscellaneous internal expenses, including: (1) $1,429,518.90 relating to the BFFT; (2) $938,089 incurred in connection

with the November 2010 meeting; (3) $511,734 incurred internally to rectify errors in engineering reports submitted by Plaintiff; (4) $13,310 stemming from a faulty heat exchanger on the SRP; (5) $33,046 for travel to Israel; and (6) $26,092 in damage to the SRP during shipment.

As to the first amount, Defendant submits a letter from Toshiba claiming $1,429,518.90 in damages relating to the BFFT. This is the same letter discussed above with respect to Boeing charges and liquidated damages. Doc. 122-6, Ex. DD. The letter states only that Toshiba is making a "claim" against Defendant in this amount. The letter does not show that Defendant has incurred or will incur this expense, nor does it show that the claimed $1,429,518.90 is attributable entirely to Plaintiff. Defendant's claim for this amount, as its claim for liquidated damages, is speculative.

As noted above, Defendant claims that Toshiba has withheld payments of $2,596,000, but this fact does not establish the damages caused by Plaintiff. It is not known today whether some or all of the $2,596,000 will be paid by Toshiba in the future. The Court noted above that the Prime Contract has not been terminated, and it appears Defendant is continuing to attempt to work with Toshiba in providing an SRP to the JMOD. But even if this amount is not paid by Toshiba in the future, one cannot know today how this amount would be allocated among the more than $3 million in damages Toshiba claims against Defendant, and what portion, if any, would be attributable to Defendant's current claim for damages against Plaintiff. In other words, Defendant's evidence presents little more than the possibility that Defendant will incur this $1,429,518.90 BFFT expense in the future, and even that possibility does not establish that Plaintiff was the cause of all of it. Because a reasonable jury could not conclude that Defendant has in fact been injured in the amount of $1,429,518.90 as a result of Plaintiff's conduct, summary judgment will be granted on this amount. *Anderson*, 477 U.S. at 248.[3]

---

[3] The Court pauses to note that Defendant is losing claims that it cannot prove because they are not ripe – the evidence today does not show that Defendant in fact will incur the damages claimed by Toshiba. Defendant nonetheless has chosen to assert the

- 14 -

1   Defendant's remaining categories of internal expenses fare no better.  To support
2 these claims, Defendant relies entirely on the deposition testimony of an accountant,
3 Robin Barrett, and a list of activity codes used to calculate internal costs.  Doc. 122-6 at
4 40.  Ms. Barrett's testimony provided no evidence, however, that the various categories
5 of expenses were in fact incurred as a result of Plaintiff's alleged breach.  She testified
6 that she reviewed a list of accounting codes used by Defendant to track employee labor
7 and expenses and the clients to whom they were billed, and that these lists were generated
8 by requesting data from Defendant's ledger system.  *Id.* at 40.  But she provided no
9 testimony that the amounts recorded under these various accounting codes were in fact
10 incurred because of Plaintiff's breach.  To the contrary, when asked for details about
11 amounts listed under the various accounting codes, Ms. Barrett was unable to provide
12 any.  She repeatedly testified that she knew nothing more than the titles on the accounting
13 codes and could provide no details about the work actually performed or the expenses
14 actually incurred.  *See, e.g.*, Doc. 122-6 at 52, 54-55, 58, 61, 62-63, 65-67.  What is more,
15 the excerpt of Ms. Barrett's deposition provided by Defendant is incomplete.  It excludes
16 all but two of the first 40 pages of the deposition, during which many terms were defined,
17 and it omits most of the exhibits being discussed during the questioning.  Doc. 122-6.
18 The Court and its staff have read the deposition excerpt more than once and simply
19 cannot find evidence linking the numbers about which Mr. Barrett testified to any breach
20 by Plaintiff.  Because no reasonable jury could conclude from this evidence that Plaintiff
21 in fact caused the losses claimed by Defendant, the Court will enter summary judgment
22 on the counterclaim for the following amounts:  $938,089 incurred in connection with the
23 November 2010 meeting; $511,734 incurred internally to rectify errors in engineering

---

claims now and has failed to make the showing necessary to resist summary judgment, resulting in their elimination by summary judgment.  Defendant could have chosen to assert the claims in a later action after its obligations to Toshiba were clear, but it did not do so.  Defendant cannot claim that it was forced to assert the claims in this case as compulsory counterclaims.  The compulsory counterclaim rule applies only to claims that exist at the time a defendant serves its pleading.  Claims that are not mature at that time need not be asserted.  *See Allan Block Corp. v. County Materials Corp.*, 512 F.3d 912, 920 (7th Cir. 2008) ("Rule 13(a) does not require the defendant to file as a compulsory counterclaim a claim that hasn't accrued yet") (citing cases).

reports submitted by Plaintiff; $13,310 stemming from a faulty heat exchanger on the SRP; $33,046 for travel to Israel; and $26,092 in damage to the SRP during shipment. *Anderson*, 477 U.S. at 248.

**IT IS ORDERED:**

1. Plaintiff's motion for summary judgment (Doc. 109) is **granted** on Defendant's counterclaims for liquidated damages, lost profits, and the following internal expenses: (1) $640,177 relating to work performed by Boeing engineers and passed onto Defendant; (2) $1,429,518.90 relating to the BFFT; (3) $938,089 incurred in connection with the November 2010 meeting; (4) $511,734 incurred internally to rectify errors in engineering reports submitted by Plaintiff; (5) $13,310 stemming from a faulty heat exchanger on the SRP; (6) $33,046 for travel to Israel; and (7) $26,092 in damage to the SRP during shipment. The motion is otherwise **denied**.

2. Defendant's motion to file under seal (Doc. 123) is **granted**. The Clerk is directed to accept for filing under seal the document lodged on the Court's docket as Doc. 124.

3. Defendant's motion to supplement (Doc. 133) is **granted**.

4. The Court will set a final pretrial conference by separate order.

Dated this 11th day of December, 2013.

_____
David G. Campbell
United States District Judge